### WILLIAM WALDRON vs. THOMAS W. LETSON.

When a parcel of land is sold under a decree of foreclosure, and is struck off and conveyed to the purchaser under an erroneous impression that the mortgage covers the entire tract, the price for the entire tract being bid and paid, and the purchaser put into possession, and it is afterward discovered that, from a mistake in the description, the mortgage does not cover the entire premises intended to be mortgaged, by reason whereof the legal title fails, the purchaser is entitled to be protected in the peaceable possession of the land purchased.

Had an application been made on behalf of the mortgagee to reform the mortgage prior to the date of foreclosure there could have been no doubt of his equitable title to relief. And if a mistake in a mortgage may be corrected it is just and equitable that the mortgagor should abstain from availing himself of the mistake to the prejudice of the purchaser.

It is not gross carelessness in a purchaser at a sheriff's sale not to know that the description in a sheriff's deed does not include the entire premises which are understood to be offered for sale.

In this case the devisee of the mortgagor was restrained from proceeding by ejectment to recover the possession of that part of the premises accidentally omitted from the mortgage, and was decreed to release the same to the purchaser.

---

*H. V. Speer*, for complainant.

*R. Adrain*, for defendant.

THE CHANCELLOR. In the year 1819, Thomas Letson was seized and possessed of a lot of land and premises, at the corner of Albany and Spring streets, in the city of New Brunswick, known as the tanyard lot. To the entire front of the lot on Albany street, and to about one hundred and nineteen feet of the front on Spring street, he claimed title by two deeds; the first from the trustees of Freeman, dated . in 1813, for that part of the premises which composed the

original tanyard lot, and the second from Philip Oakey, dated in 1822.  In 1819 the original tanyard lot was enlarged by the addition of thirty feet on Spring street, or Spring alley, taken from the north, or rear end of two lots owned by Letson, fronting south on Church street.  In 1828 the tanyard lot was further enlarged, by additions from the north, or rear end of other lots on Church street, owned by Letson.  Being thus seized, on the twenty-fifth of January, 1851, Thomas Letson executed to his son, John S. Letson, a mortgage to secure the payment of $6000 " on all that certain lot of land, with the erections thereon," situate on the southerly side of Albany street, describing the land by metes and bounds, included in the two deeds from the trustees of Freeman and from Oakey, but not including the additions subsequently made to the premises from the rear of the Church street lots.  On the fourth of February, 1859, upon a bill filed by William Dunham, an assignee of the said mortgage, a decree was made for the foreclosure and sale of said mortgaged premises.  On the thirteenth of July, 1859, the premises were sold, by virtue of an execution issued upon the said decree, by the sheriff of Middlesex to William Waldron, who became the purchaser for $5530.  On the twenty-seventh of July a deed, in pursuance of the sale, was executed to the purchaser.  At the time of the sale, and for many years previous, the additions made from the Church street lots had been enclosed and used with the tanyard lot, as a part of the same premises.  They were so at the time of the sale.  Thirty feet of the principal building on the premises then stood on the ground taken from the Church street lots not included within the description of the mortgage.  The property, when offered for sale under execution, was spoken of by the sheriff as the tanyard property, though no description of it was given by him variant from that contained in the execution.  The purchaser took possession of the whole premises enclosed and known as the tanyard lot, and has expended $500 in repairs of the building on the premises. On the thirty-first of May, 1861, Thomas W. Letson, a son

of the mortgagor, who claims title to the premises by devise of his father, commenced an action of ejectment for the recovery of the thirty feet on Spring street upon which the grist mill stands. The bill in this cause was thereupon filed, claiming that the mortgage, execution, and sheriff's sale were intended to cover and convey the entire lot, with the buildings thereon, praying that the sheriff's deed might be reformed and rectified by inserting sixty-three, instead of thirty-three feet, as the length of one of the lines on Spring street, so as to include the premises in dispute, and that the plaintiff in ejectment might be restrained from further prosecuting his action.

It is satisfactorily shown, by the evidence, that the mortgage was originally understood and designed to include the premises in dispute. As early as 1819, the thirty feet on Spring street was added to and made parcel of the tanyard, a bark-shed being erected thereon, and forming the south line of the lot. Since that time it has been used and occupied as a part of the tanyard lot, and lain within the same enclosure. In 1822, Thomas Letson, the mortgagor, sold and conveyed the adjoining lot on Church street up to the bark-shed. The boundaries of the tanyard, so far as the present controversy is concerned, continued unchanged from the year 1819 to the present time. In 1839 the mortgagor, by will of that date, devised the premises to his son, Thomas W. Letson, by the following description : "The tanyard lot and buildings, including all the land on Spring alley to lot of John S. Letson in Albany street." Under this devise the defendant claims title to the premises in dispute, and they are undoubtedly included in the description. On the twelfth of May, 1848, articles of agreement were entered into between Thomas Letson and his son, Thomas W. Letson, by which the premises were leased to the son for a term of years, in and by which instrument it was agreed, among other things, that the lessor, Thomas Letson, should erect a substantial brick building on said lot for manufacturing purposes for the benefit of the lessee. The agreement recites that " Thomas

Letson is seized and possessed of a certain lot and premises, with the buildings thereon, situate at the corner of Spring alley and Albany street, in New Brunswick, and by his said last will and testament hath devised the said lot of land and premises unto the said Thomas W. Letson." A brick building was thereafter erected on the premises, fronting on Spring alley seventy feet, by forty feet in depth. The south end of of the building corresponded with the south line of the tanyard lot, as previously used, so that thirty feet of its length on Spring street stood upon the ground added to the original tanyard from the rear of the Church street lots. The premises were in this situation on the twenty-fifth of January, 1851, when the mortgage in question was given by Thomas Letson to his son, John S. Letson. The mortgagee testifies that the mortgage was understood by him to cover the whole lot, and he believes it was so understood and intended by the mortgagor. The counsel of the mortgagor, by whom the mortgage was drawn, and who also drew the will of the mortgagor and the lease from him to his son Thomas, states that he was instructed by the mortgagor to prepare the mortgage upon the share of his real estate which he had devised to his son, Thomas W. Letson, assigning particularly his reasons for placing the mortgage upon that property, and that the mortgage was intended to embrace this property. The written instruction to counsel, or the statement of the mortgagor's wishes, written two days before the date of the mortgage, is produced, in which the mortgagor states that, as many changes have taken place since his will was executed, he desires some alteration respecting that portion given to Thomas W. Letson; " that he has placed in cash $6000, which he wished to be secured by bond and mortgage in favor of John S. Letson *on the mill and tanyard property.*" The "*mill*" upon which the mortgage was to be given was the brick building, thirty feet of which stands outside of the lot described in the mortgage. The mortgage was given, in part at least, as security for money advanced in the construction of that building; and yet the description of the premises

contained in the mortgage runs nearly through the centre of the building, utterly destroying its value for all the purposes for which it was intended and used, and greatly impairing the security of the mortgage. It is incredible that such should have been the intention either of the mortgagor or mortgagee. By an agreement, entered into on the twenty-second of February, 1851, by the mortgagor with his son, John S. Letson, it is recited that the mortgagor had agreed with his son, Thomas W. Letson, to erect a brick building on the lot at the corner of Spring alley and Albany street, at a cost of $2000; that the building had been erected at the cost of about $4000, and that he had executed a bond and mortgage *on said premises* to secure John S. Letson, &c.

The evidence renders it certain that the mortgage was understood and intended by both parties to cover the premises in dispute. The mistake arose from adhering, in the description, to the boundaries of the property as originally purchased, without adverting to the additions made from time to time to the rear of the lot from portions of other lots owned by the mortgagor. It was understood that the mortgage included the premises in dispute during the life of the mortgagor, after his death, and at the time of the foreclosure and sale by the sheriff. The purchaser entered into possession of the entire premises, as they had been held, used, and occupied by all the parties for over thirty years. Thomas W. Letson, by his answer, admits that at the time of the sale he was not aware that the mortgage did not include all the premises devised to him as they then existed, or that he had any claim to any part thereof by reason of its not being covered by the mortgage, and he excuses himself on this ground for not stating his claim at the time of the sale.

Had an application been made on behalf of the mortgagee to reform the mortgage prior to the decree of foreclosure there could have been no doubt of his equitable title to relief. There is no more familiar or salutary exercise of the power of a court of equity to relieve against mistakes in written instruments than that of correcting mistakes in the descrip-

tion of the boundaries of lands conveyed or mortgaged. It is equally clear that if the purchaser at the sheriff's sale had discovered the mistake before the delivery of the deed and the payment of the purchase money, he would have been relieved from the obligation of his bid on the ground that the bid was made under a mistake.

The real question in the cause is whether the party is entitled to relief in the situation in which he now stands, and if to any, what that relief should be. Can the alleged mistake be rectified?

There is no mistake in the sheriff's deed. There is no variance or discrepancy between the description of the premises in the deed and in the execution. The sheriff has conveyed all that he was commanded or authorized to sell and all that he advertised for sale.

Nor is there any mistake in the proceedings in chancery under which the sale was made. The bill of complaint describes the property as it is described in the mortgage. The execution follows, as it must necessarily do, the description in the bill. The premises conveyed by the sheriff were the same as those described in the bill, execution, and advertisements of sale, and were the only premises of which a sale could have been decreed under the bill filed in the cause. There is, then, no mistake in the proceedings which can be corrected. The mistake exists, not in the proceedings for foreclosure, but in the original mortgage upon which those proceedings are based. The correction, if anywhere, is to be made there where the error originated. But the time has passed for correcting either the mortgage or the proceedings under it. The mortgage has been extinguished, or the rights of the mortgagor under it determined by the decree. The decree has been executed. The rights acquired under it are vested. I am clear that the specific relief prayed for cannot be granted.

Is the complainant without remedy?

The complainant claims to be protected in the possession and enjoyment of the premises for which he bid at the sheriff's

sale and for which he paid the purchase money. They are the same premises which it was understood and believed, by persons present at the sale, were being sold. They are the same premises which the mortgagor agreed to mortgage, and which the mortgagee accepted as security for the mortgage debt. The mortgagee has received the price of the whole lot in satisfaction of the mortgage debt. The mortgagor has been relieved of his indebtedness to the extent of the price of the whole lot. The parties now stand, in the full enjoyment of all their rights, precisely as they would have done had the mortgage been drawn, and the sale and conveyance made according to the intention and understanding of the parties. The complainant would seem to present a very strong claim to be protected in the quiet enjoyment of the premises, as against the mortgagor and his devisee. Having had the price of the entire lot applied to the extinguishment of the mortgage debt, he can have no equitable title, as against the purchaser, to any portion of the lot.

I proceed upon the assumption, which is fully justified by the evidence, that it was understood not only by the purchaser, but by the bidders and persons generally at the sale, that the entire lot was being sold, and that the price for which it was struck off was the price for which the entire lot would have sold. If it were otherwise the rights of the mortgagee would have been prejudiced, and he, and not the purchaser, would have been entitled to equitable relief.

It was suggested, upon the argument, that the whole difficulty originated in the neglect of the purchaser in not examining the description in the sheriff's advertisements, and that a party will not be relieved against the consequences of his own gross carelessness. But is it gross carelessness in the purchaser at a sheriff's sale not to know that the description in the sheriff's deed does not include the entire premises which are understood to be offered for sale?

Undoubtedly the purchaser is bound to use reasonable diligence in ascertaining what the property is for which he is bidding at a public sale. But suppose he examines the de-

scription in the advertisement, how shall he know, except by
an actual survey, that the description does embrace the entire
premises which are offered for sale? He may ascertain
whether the description corresponds with the description in
the execution; but how shall he know whether the execution
follows the mortgage, or whether there are misdescriptions in
the mortgage, or whether it covers the entire premises de-
signed to be mortgaged?

Under a sale by execution at common law of a house and
lot or of a farm, how is the purchaser to ascertain whether
the description in the sheriff's deed includes the whole pre-
mises? In the present case it is obvious that the discrepancy
between the description in the advertisement, and the visible
boundaries of the lot, as offered for sale, could only have been
ascertained by actual measurement.

The objections to granting relief to the purchaser are en-
tirely of a technical character. The question arises between
the devisee of the mortgagor and the purchaser under the
sheriff's sale. There are no intervening equities to be affected
by the decree. The mortgagee is a party to the bill, and
admits the complainant's equity. The rights of persons in-
terested, if there be such who are not parties to the bill, can-
not be prejudiced by the decree. There is no necessity for
an amendment either in the mortgage or the sheriff's deed.
The ground of relief is, that it is equitable that the com-
plainant should be quieted in the enjoyment of the premises
in dispute. All that is required is that the defendant, the
devisee of the mortgagor, should be restrained from proceed-
ing at law, and should be decreed to release his title in the
premises to the complainant.

The form of relief was administered by Chancellor Kent,
in the case of a sheriff's sale under an execution at common
law, where a mistake, as to the extent of the premises, was
made in the sheriff's deed, under circumstances very similar
to those which exist in the present case. *De Riemer* v. *Can-
tillon,* 4 *Johns. Ch. R.* 85.

There is, it must be admitted, this distinction between the

cases. In that case the mistake existed only in the sheriff's deed. The sale was made in pursuance of power vested in the sheriff, and in accordance with the terms of his advertisement. Here the mistake originated in the mortgage. There was no mistake in the sheriff's deed. And the complainant is asking to be protected in the enjoyment of property for which the sheriff neither did nor could convey a legal title. But that circumstance, while it increases the apparent difficulty of administering relief, does not affect the substantial equity of the case.

There is in this case a further ground of equity, *viz.* that the defendant stood by and permitted the property to be sold, and the purchaser to make improvements on the premises, without making known his title. But I am not disposed to rest the case at all upon that ground. I rest it upon the broad principle, that where a parcel of land is sold under a decree of foreclosure, and is struck off and conveyed to the purchaser under an erroneous impression that the mortgage covers the entire tract, the price as for the entire tract being bid and paid, and the purchaser put into possess on, and it is afterward discovered that, from a mistake in the description, the mortgage does not cover the entire premises intended to be mortgaged, by reason whereof the legal title fails, the purchaser is entitled to be protected in the peaceable possession of the land purchased. If the mistake in a mortgage may be corrected, it is just and equitable that the mortgagor should abstain from availing himself of the mistake to the prejudice of the purchaser.

I think the defendant should be perpetually enjoined from proceeding at law, and be decreed to release his right and title in the premises to the complainant ; the form of release, if counsel cannot agree in regard to its terms, to be approved by one of the special masters of the court.

The decree to be made without costs to either party, as against the other.